Good morning. We're going to call Juan Carlos Sanchez Sanchez v. Ashcroft first. Good morning, Your Honor. Well, you have a little work this morning. Good morning, Your Honor. Good morning, Your Honors. Kevin Bovet for the petition in this case. May it please the Court. I must remind the Court that the Ninth Circuit in this case is reviewing the BIA decision and not the immigration judge decision. Yeah, we know that. Pardon? Yeah, we know that. Yes, sir. We dream about that every night. I know you do. And the BIA decision denies cancellation of removal under the Ramales case and saying that the Ramales case said that a return under threat of deportation ends continuous physical presence. The BIA decision, however, does not cite a factual basis for its denial under the Ramales, i.e., there is no threat of deportation in this case, nor is there anything in the record that will provide a factual basis. True, the government counsel astutely points out that the petitioner signed for voluntary departure, but that's still no threat. Perhaps this was an agreement under the Vasquez-Lopez case, but what kind of agreement was it? Was it an agreement to give up hearing rights in exchange for the government's agreement not to commence deportation proceedings? There's no evidence of this agreement. In fact, there's evidence of the contrary. The Border Patrol did not ask the petitioner if he wanted a hearing, and that's at page 120 of the record. And so the Border Patrol did not ask the petitioner if he wanted a hearing, much less did it advise the petitioner of his hearing rights, his right to counsel, his right to a bond hearing, his right to present evidence, and his right to appeal to the BIA. The lack of agreement is particularly troubling in this case, where the immigration judge had found that the petitioner had established the requisite level of hardship to his qualifying relative who had a citizen child. The lack of the agreement is also troubling in the law enforcement context generally, because we want legitimacy in that context, and we also need to see rule of law in that context. The lack of an agreement or any kind of factual evidence in this case is also troubling under the statutory scheme governing voluntary returns and continuous physical presence, because there is no express provision in the statute stating that a voluntary return ends continuous physical presence. That's true. Ramallah said that the voluntary return would do it, as the discourse in Vasquez Lopez, but there still had to be the threat of deportation. Now, let me ask you this. If your position turns out to be the law, what's the Border Patrol supposed to do when they pick these people up? Because, you know, they'll enter them into their database. But the practice is, unless they're repeat offenders or there's something else that really brings them to their attention specifically, you know, they're just busloads that go back every day. That's true. But if all of a sudden we hold that that sort of a return is not under threat of deportation and therefore does not interrupt continuous stays, what, are they going to change that practice? I mean, are they going to? Well, Your Honor. And the practice is basically as a sort of a benign, you know, unless you're a really bad person, we're going to leave you alone practice. Yes, sir. But the respondent did sign something. Something is signed. There must be some record someplace. Maybe it's not readily available. It's not in evidence of this case. But the respondent signed something, and that something presumably is a waiver of hearing rights or you want to fight your case, yes or no. And I've seen on the notice to appear on the charging document in a removal case, they have that. I don't know what they have in a pre-commencement of deportation case setting. But the respondent, the petitioner testified that he signed something. So presumably they said, well, do you want to fight your case, yes or no? If you don't, you're going back to your country. I agree. It seems to create a, it may create an additional administrative burden if this Court is in effect imposing a type of Miranda warning system on these cases. Well, you can fight your case if you want. You have the right to counsel, bond. But again, they're signing something, and it seems that if there's going to, the law does allow for relief to many of these individuals. Refugees, people who have been in the country for a long time. And so there is potentially relief available. It seems that the law should, to truly make that relief available, there should be some minimum, minimum advisal of yes, you have the right to leave today. No, nothing, no hearing at all, no deportation case. But you also have to renounce your right to hearing, counsel, bond, hearing. And is the standard, there must be, you take voluntary departure under threat of deportation, and the issue really is here is how much was the threat? I mean, is that what the question is in front of us? Well, I think so. And I'm not sure, because, again, the federal model is case. I'm sorry. I'm sorry. The federal model is, and before Vasquez-Velpez, the immigration judges were saying, well, the statute doesn't even contemplate a VR, a voluntary return, being interruptive, as the judge said in this case. He specifically found that he knew of the returns, but he said that Congress had changed the scheme, and that was no longer important. I think, Your Honor, that we need, at least the very minimum, in this case, we need a copy of whatever the petitioner signed to establish the existence of the threat and determine the nature of the agreement. Okay. And that copy presumably exists, but it's not in evidence today. And because there is no specific finding by the BAA that there was a threat under Romales or the agreement under Vasquez-Velpez, remand is necessary to address these factual issues. The government should be able to easily introduce whatever it is that the petitioner signed. I suppose you didn't sign anything where they can't find or come up with what he signed. Then your position would be that one. Well, then he goes back to the IJA, and the IJA asks him questions, and, you know, did you? In fact, I once had a case, Your Honor, where the person, the alien testified, and the judge said, well, no, that was not a Romales return because he wasn't really explaining his rights. And so some of the ideas might do that. But it's essentially a factual issue. I don't think we have to have the whatever he signed in evidence. The government attorney or the immigration judge could ask the alien, did you? Were you offered a hearing? Didn't they say you could fight your case or just go home? At a minimum, Your Honor, remand is necessary to allow the petitioner in this one case to brief the new basis of denial that was articulated by the BIA because the BIA could have just, as is doing in all the other cases, affirmed the opinion, the IJA decision. Instead, it gave a new basis of denial and really didn't give the petitioner an opportunity to present this argument to the BIA. Thank you. Thank you. Good morning, Your Honor. I say please support. As petitioner's counsel stated, the issue is whether those three voluntary returns in 1992, 1994, and 1999 interrupted continuous physical presence. And the government's position is that issue was squarely decided by this court in Vazquez-Lopez. There are also published decisions from the board in Romales and recently by the Fifth Circuit in Morales-Valdez, all of which address this issue and which decided contrary to the alien. In Vazquez-Lopez, this court noted with regard to the service practice of allowing these administrative voluntary departures that an administrative voluntary departure under the statute is something that occurs with the permission of the Attorney General in lieu of removal proceedings. So petitioner's argument that he received no warnings or no advisals in these regards has been rejected by the courts. And furthermore, there's no statutory or regulatory requirement of any notice of advisal with regard to aliens granted voluntary departure. There is an advisal requirement in the regulations at 287.3, which relates to the disposition of cases in which aliens are arrested without a warrant. But that rights advisal occurs only with regard to aliens placed into proceedings. There's only one problem. I mean, your argument seems to me quite strong. There's only one piece that troubles me just a little bit, and that is it's possible that someone will have been given voluntary departure, voluntary in the sense that that's what we call us, quite involuntary. You put them on the bus and you take them back to Mexico. I mean, they're not given any choice in the matter, but we call it voluntary departure. But the question is, the threat of deportation, what if the threat is actually an empty threat? For example, if the person had actually been placed in removal proceedings, the hardship would have been there was even then continuous residency either at an earlier period, seven or now ten years, and there was enough hardship. So, I mean, it's a threat, but the truth is it wouldn't have eventuated. Is that enough of a threat within the meaning of the law? Well, I would beg to differ with you. I mean, is there a difference between a threat and an empty threat? I don't believe it's an empty threat. It is true that the now Department of Homeland Security has the practice of regularly permitting non-criminal and non-terrorist aliens to accept a voluntary return. But that, in fact, is their choice whether they wish to return to their country, frequently Mexico in this case, Mexico. It's a choice made by the alien. The Border Patrol has no authority other than that granted by the Immigration Act, and its authority under the Immigration Act is to arrest and appropriately dispose of cases of aliens who were found illegally present in the United States. In this case, and on these three occasions in which this alien tried to reenter the United States without authorization, he was arrested, detained by the Border Patrol, made this affirmative choice to accept a voluntary return. I think his testimony, to my knowledge, is pretty clear on this, that he signed on for voluntary departure knowing that he was here illegally. Yeah. Now, how burdensome would it be for the government to have documentation when you're sending these people back on this kind of voluntary departure that, you know, they sign something that says, listen, this is under threat of deportation or now removal? Well, there are some records kept of these individuals. It frequently comes up on an NCIC check that the person was arrested. That's how you know, in fact, we have these three voluntary departures is that you kept records. Well, in this record, those documents do not exist because of the alien's voluntary admission that he was returned on those three occasions. And since he bears the burden of proof on a cancellation. How do we know, in fact, this occurs to me, how do we know that he had these three voluntary departures? I mean, it's the government's records, right? There are no records present in the record of proceedings in this case. Rather, that was based on the alien's own admission. He admits he was arrested by the Border Patrol. He admits that he signed on for voluntary departure. Those records, there was no need for the service to introduce those records in this case. In the ordinary case, would the service have records of this? The service has some records. The format of the records has varied from time to time, so I would not be able to tell you exactly in what form those records might exist. But at the very least, there's some sort of record. My impression is that when the service does a voluntary return, they make an entry that we have voluntarily returned this person. Sometimes you're going to have trouble making sure it's the same person and so on, but they do keep records of everybody they send back so they know, or at least try to know, is this the tenth time you've tried to do this? That's correct. And they do print to people, so they'll know if they, in fact, come back again. But in this case, what the Petitioner's Counsel is essentially asking this Court to do is to write the law to require a rights advisal, a detailed rights advisal, and proof of that rights advisal placed in these records of proceedings. And neither the statute nor the regulations require any such rights advisal. And so, therefore, I think that what he's asking you to do is beyond the scope of your authority to do. Yeah, it seems to me that what he's asking for in terms of rights advisal goes well beyond establishing threat of deportation, which is the standard. But do we have to have anything that shows threat of deportation beyond the fact of voluntary departure? Because that's all we have here is the voluntary departure. Well, the threat of deportation, as far as I'm concerned, is implicit in the authority of the Border Patrol, and perhaps even explicit in the authority of the Border Patrol. The Border Patrol simply has no authority just to stop people. It stops people who are illegal aliens present in the U.S., and it's only under that authority granted to it by the Act that it has any way in which to exercise it. They make mistakes sometimes. I mean, we've had cases where American citizens are, quote, voluntarily returned to Mexico because the INS mistakes them for Mexican citizens, and they're somehow unable to convince the INS that they are American citizens. So maybe they're sent under threat of deportation, but the truth is they're American citizens. There's no way they could be deported if they were actually brought forward. If that indeed occurs, and I don't have any independent knowledge of that, it's not what occurred in Mexico. It's not this case. It does occur from time to time. In fact, you've got a major damages case pending against you because the INS, quote, voluntarily deported someone who wasn't mentally all there, and by the time his family found him a month later, he really wasn't all there. I mean, these do happen, not very often, but they happen. Right. I am aware of that, but that's external to this case. Of course it is. Essentially, I think the case is clearly controlled by Lascaz Lopez, and this Court should dismiss the petition for review. Thank you. One minute, Your Honor. Sure. The petitioner is not asking the Court to write new law because the statute is very clear. The statute doesn't even punish someone or doesn't even interrupt, at least on his face, does not end continuous physical presence by the voluntary return. So really, we're now just looking at the Romales case and the Lascaz Lopez case. These were attempts to craft some judicial law that would effectuate the intention of Congress. But why didn't Congress put this in the Act in the first place? It would have been easy enough to do. There were other provisions that ended physical presence. So it seems to me that we're not asking the Court to craft a new law or a random warning set, but if we follow the Romales and the Lascaz Lopez holdings, there must be a threat of deportation. Otherwise, that language is meaningless. Thank you, Your Honor. Thank you. All right. Thank you. The matter will be submitted. We'll go back to the head of the calendar, action embroidery versus Walcott, Rivers, and others. Thank you.
judges: Pregerson, Cowen , W. Fletcher